OK, Mr. Crawford, I'm sure I didn't do a very good job of pronouncing the name of your client. Your Honor, may it please the Court, I'm Todd Crawford, and I'm going to tell you I represent OTM, because I would do an even worse job of pronouncing my client's name, and I apologize. Your Honor, this is an appeal of a motion for summary judgment that was granted to Diversified at the District Court. The review was de novo, so any material issue of fact that this Court identifies is sufficient to reverse and remand this for a trial. I would tell you that predominantly what is being presented are issues of fact, that is, the actual factual arguments involved in the case. One of the few legal issues that I would raise is the District Court did not even address at all what I would call a vanilla breach of contract claim. It is not addressed in the motion for summary judgment filed by Diversified. It is not addressed in the District Court's opinion. And what I would call a vanilla breach of contract claim is something as simple as, did you get what you paid for? What exactly is your breach of contract claim? Because sometimes in your briefing it seems to be they did nothing at all in terms of repairs. Other times it seems to be they did some stuff, but not an engine overhaul. So which of those two is your claim? Let me address that. It's both, Your Honor. Let me explain. One reason we focus so much on the engine overhaul is because it provides an objective measure, an objective measurement of showing that what they said they did, they did not in fact do. I hasten to add, it is not the only thing that they did. Did you also claim they did nothing at all? I will tell you that I do not believe, and I don't think that the record reflects, that they did engine overhauls or rebuilds. That's correct. Let me put it this way, Your Honor. If I ordered a pizza with the works and you send me a plain cheese pizza, you breach the contract. You didn't give me what I ordered. You didn't give me what I asked for. And on that issue, what it is that I ordered is itself a material issue of fact in this case. You don't have to look any further. So it sounds like the claim is we didn't get an engine overhaul. That begs the question, and it's difficult because there's no written contract, but what is, in your view, an engine overhaul? Well, Your Honor, that's delineated in the expert reports and what types of specific things are in fact replaced and not replaced. But going back to the question that I was about to answer for you is what is, what isn't that we actually ordered. That is fundamentally disputed in the case, and you don't have to look any further than page 48 of my opponent's brief. Because on page 48, they acknowledge that the scope of diversified contractual undertaking is a disputed issue of fact. They also acknowledge whether OTM authorized all of the repairs recommended by Diversified were in fact authorized. Those are two significant disputed issues of fact, and the recent significant by way of background. What originally happened is before there's ever a purchase, OTM goes with the president of Diversified to go look and inspect these particular vessels. Mr. Boudreaux implicitly improves their purchase and says basically it'll cost approximately $50,000 per boat to get them operating and running so that you can take them down and operate them in Columbia. He then takes them back to his yard where OTM ultimately pays him $350,000. Now, here's the key. OTM's position and the testimony is what he was actually asked to do is start from where it go, which is why there isn't a written contract saying precisely what will and will not be done because the scope of their undertaking was to identify everything that needs to be done to these boats. And per OTM's testimony and the dispute, OTM authorized everything that they said needed to be done. So when you have vessels that immediately fail within two days of their departure, if the scope of work was to do everything that has to be done to make these vessels operational and they fail within two days, you've obviously breached the contract. That in itself, number one, is a material issue of fact. Well, it was my understanding that the defendant claims you refused certain repairs and you're saying you didn't, so maybe we've got a genuine dispute of material fact right here, but what repairs are they claiming you refused that would bear on the seaworthiness of the vessel? The very modest things that they claim that we disputed, that we denied, were like a, oh gosh, I've forgotten the term for it, but it's like a, it's about a $1,000 item. It's about a $1,500 item and it's, I'm drawing a blank, I apologize. But did it have to do with overhauling the engines? It was not associated with the engines itself. So you're saying that for all repairs associated with the overall of the engines, which is the critical factors here, OTM agreed to those repairs? Absolutely, Your Honor, and just to point out the fact of the material issue of fact, it's actually embedded on page 11 of the district court's opinion. In a single sentence, he says, OTM cites the deposition of its principal, Gonzalo Martinez, and nothing more, to submit that OTM allowed Diversified to make all the repairs that it recommended. But work tickets show that certain repairs that Diversified recommended were rejected by OTM. So in a single sentence, in the district court's own opinion, on page 11, he very specifically identifies a material issue of fact as to whether it was authorized or not authorized. I will tell you that in the end, the party that OTM is identifying as having said was not authorizing these things is not an employee, is not an agent of OTM, that Diversified is saying, oh, this guy told us not to do these repairs. He's not our agent, he's not our employee, and the record evidence is that he was not, in fact, authorized to reject anything, and in fact, we authorized everything that was ever requested. Now, turning to attention to the question of the overhauls and whether there was an overhaul and whether there was some repudiation, that was their whole basis of their argument was, well, all of these experts who said that there had not, in fact, been an overhaul, folded like an accordion under cross-examination and completely changed their testimony. I have it marked. What is an overhaul? I still haven't heard that. I mean, it seems, you know, they say it's semantics, and that's a key question if that's your claim. I mean, is there a standard industry definition of overhaul? Your Honor, yes, but I'm not a mechanical man. I'm not an expert, and I don't want to sit here and try and tell you in technical terms what is and is not an overhaul. What I will tell you is what the experts testified to, and each and every one, because they have reports that they made, and for the most part, what you need to understand also, these are not litigation experts, if you will. The original experts are mechanics and technicians who work for world-renowned Detroit Diesel, you know, organization, Stewart and Stephenson, and they go through and they document with photographs all of the different things that are present that they see. And so the testimony, and I apologize I'm having to answer it this way, but the testimony is what does the photograph number one show? It shows such and such a part. Well, what can you tell about this? Does this indicate to you whether there's been a recent overhaul or not? It indicates there's not been a recent overhaul. And they go through that in complete delineation, and that includes Mr. Hoyos, Mr. Santamaria, Mr. Guerrero, and David Marion, who was the vice president of engineering of Detroit Diesel. Now, he was our retained expert who's coming in here and explaining all of these details. They're still trying to suggest that they got a complete repudiation of his opinions as well. Now, he's offered two significant opinions, and that is— Who is he? Mr. Marion. He is an expert in Detroit Diesels. He says in his report, there is no evidence that the two engines from the Mary Tide were overhauled and the one engine from the Thomas Tide was rebuilt. There is evidence from the surveys in Columbia that the subject engines were not overhauled or rebuilt. Secondly, because their argument or their contention was, well, they were perfectly fine when they left here, but operational issues that happened during the voyage is what caused them to look like what they looked like when they got to Columbia. He says the voyage from Louisiana to Columbia cannot explain the absence of evidence of an overhaul or rebuild as indicated above. We don't just have one expert, Judge Costa, who is saying there had not been an overhaul or there was not evidence of an overhaul. What counsel is pointing to is literally a single comment from Mr. Marion that there had been some work. Let me just tell you, I will tell you there had to be some work done to those three engines because they were seized. They weren't working. That was the whole point why they identified those three as needing to have an overhaul or a rebuild. And so, yes, was there some work done to them? Sure. Does that mean that you have not breached the contract? If you represented to me that you did a full-blown overhaul and it turns out that you did not, and I have four people who say there is no indication of a recent overhaul, that is sufficient to create a material issue of fact and require a trial. Even if that is so and there is a fact issue as to that, I don't see any kind of a fact issue as to causation, that is to say whether any allegedly inadequate or nonexistent work on the engine caused the engines to fail at a later time. Well, and I take issue with the whole premise that I have to identify the precise reason for the failure of the engine as opposed to you didn't do the work at all. And let me just give an analogy that is pretty simple. If I take my car to the car shop and I tell the guy my brake pads, my brake shoes are bad, I need to have a brake job, and he says, great, you're good to go, charges me my fee, and I leave, and my brakes fail, okay? Now, I've relied upon him to fix my brakes. If a forensic exam after the fact demonstrates he didn't fix my brakes, I have a breach of my contract. I don't have to prove. What about the other claims, though? Let me follow up on this. You're hypothetical just a minute because, all right, so they did a sloppy brake job where they don't work on the brakes at all, and 50 miles down the road the car overheats because the radiator hose blew. There's no causation there, right? Well, I understand, Your Honor, but what I'm talking about here is do I have to prove the precise reason the brakes failed or is it sufficient for me to prove the brakes failed? What we're talking about here is do I have to get down to say in terms of the engine the number three valve is what ended up failing or is it sufficient to argue and to present evidence of you told me you did a complete overhaul of the entire engine and you did not, in fact, do a complete overhaul of the entire engine? And I interrupted Judge Costa. I apologize. I'm kind of lost on who's on first. Go ahead. Are we good? Well, it's the distinction you're making that let's assume you can't prove causation, that it's what caused the boat to fail out on the journey back to South America. It's your theory that you might not get the damages related to the failure, but you would get your money back for paying for what you didn't receive. At an absolute minimum, okay? Yes, correct. If I order a pepperoni pizza and you give me a plain cheese, I shouldn't have to pay for the plain cheese. At the minimum, I should get the difference between the pepperoni and the plain cheese because normally one is different. I should absolutely get my money back for what I paid for but did not actually get. And so in the distinction also, if you have deficient work, okay? They said, well, you did the work, but it was deficient. Well, you still have to prove causation. Well, okay. I have a leak and my plumber comes. He said he fixed the leak. He leaves and I pay him. I still have the leak. Upon investigation, all he did was wrap it up with some duct tape. Am I entitled to get my money back from that guy? Of course I am. He did not actually fix it correctly. It was deficient work. Do I have to prove? Now, if I'm going to get deterioration based upon the continued ongoing leak, sure, I'd have to prove causation. But just to get my money back for deficient work that clearly doesn't match up to any real standard, I don't have to prove that. I want to ask you this before because your time is about to run out. Assuming we find genuine disputed material fact and remand for a bench trial, how will your evidence in the bench trial differ from these depositions taken to perpetuate testimony? Will you have additional witnesses or will you just read deposition testimony? Mr. Marion is obviously going to be a live witness. The principals, Gonzalo Martinez is going to be a live witness. Jorge Martinez will be a live witness. Mr. Boudreau will be a live witness. The trial court never evaluated the credibility of any of those individuals. Mr. Boudreau was saying something about what the contract was, and Gonzalo was saying 180 degrees the opposite. There has to be a credibility determination there. I see my time has expired. You've saved time for rebuttal. Thank you. Thank you, Your Honor. Mr. Schlotterer. May it please the court, Brad Schlotterer and Todd Everidge for Diversified Marine. Also with us here today is Robert Boudreau, the owner of Diversified Marine. I have a few record transcripts. No, don't hand them to us. You can give them to the courtroom deputy afterwards if you like. You probably need to speak up just a little bit. You have a very soft voice. Did you want us to read those during your argument? Do you have one for each one of us? I did, Your Honor. It was just a couple of quotes from some testimony, but I'll begin. I think there's two claims here, Your Honor, and going to what you had spoken about, Judge Costa. They were making a breach of contract claim, and for the first time today, we're hearing that they are admitting that some work was performed. Before today, that has never been said, and when we've gone into these depositions, that has never been told to us before. In the briefs, one of their first contentions is, and we have four points on this, no work was done. The first point is that they say that Judge Feldman did not address this. When you look at page 8 and 9 of Judge Feldman's decision, I believe it is section B, little i, he specifically addresses the contract claim and the no work, and he goes through in detail each expert and how they talk about they have no evidence that no work was performed. Based on that, he said because of the sworn testimony of their experts, that they will never be able to prove that no work was performed. So he did address it. He didn't just miss it. He specifically addressed it and went through detail with their experts, page 8 and 9, section B, little i. Second point on that no work was performed. Mr. Guerrero, Mr. Santamaria, Mr. Hoyas all testified that they had no evidence that no work was performed. They would have to do a more in-depth analysis, and they spoke about exactly what they would have to do. Mr. Marion, in his testimony, I asked him that exact question on the no work was performed, and he said exactly what counsel said here today. When I asked him, I said, you know, these engines were seized. You can't tell us that no parts were put in there and no work was performed. By seized, that means the engines, when you turn the key, would not start. They were frozen. They were locked up. They were in a saltwater environment in Mexico and in Louisiana for four years without any maintenance or anything. These engines were in pretty deplorable condition. And so when you take those engines that won't even turn over and you can get them to actually run, that was the question I was asking Mr. Marion because their position up until today, first argument was you did no work at all. Second argument is you did bad work. But right now I'm just talking about that first one. So I asked Mr. Marion that, and he very clearly in his response to me said, no, they obviously changed parts. He went through some of the parts that they had changed, and I'm talking here about REC DOC 6175, page 169 of Mr. Marion's deposition. He said, no, they've changed some parts. Obviously they did some work. I'm not saying that they're not. He admitted that. And so that's what we gave to Judge Feldman. And when Judge Feldman in B-i of his decision looked at the no work argument, he said, well, their own experts are admitting that work was done. And then he goes on to B-i. Was the work that was done good work? That's where we get to the causation argument. Sticking on the no work was performed by Diversified, third argument on it. Diversified had representatives at the yard, even their own owner, Mr. Gonzalo Martinez. I'm sorry, OTM had representatives at the yard. When you look at REC DOC 2997, it's the deposition of Gonzalo Martinez, he admitted that he came to Louisiana several times, and each time he was here, he was at the yard every day watching the work. He makes that admission. So if the claim is what they're saying now, and maybe we'll have to see whether they said it before, that, well, some work was done, but the engine overhaul wasn't done. Assume with me that that is the breach of contract claim. Why isn't all the observations that were made when the boat got back down in South America about corrosion? I mean, there's various things. The rings were worn, oil and water leaks from the engine block, injectors stuck, all these different indicia that their experts said. Maybe they couldn't conclusively say it, but were indicative of an old engine that was not overhauled. Why wouldn't those create a fact dispute? Well, because up until a couple of things, Your Honor. I think we have to go with was no work performed. I think that's gone from their own admission today and from the admission of their experts. So now we're into the position of was work performed, then we start getting into the discussion of does it rise to a level of an overhaul. When you look at Mr. Marion's deposition, I got into that exact specific issue with him. And it's not that those experts are saying what they performed was a conditioned survey. And they were looking at the condition of the engine, which after everything that it encountered, I would admit that would be deplorable conditions at that time based on everything it went to with the overheating and overspeeding and all the other problems. Now, of what relevance is it when you're talking about if their contract action is no work was performed, if that is going to be gone, aren't we now into the warranty of workmanlike performance? The work you performed was either not good or you should have done some additional items. And so I don't understand how they're trying to make both arguments. And when you asked him that today, are you saying no work was done or there was some work that wasn't done? And he said we're saying both. I see it as you have two distinct arguments. Number one, if they're saying they have a contract claim that no work was done, we just dismantled that with their own admission and with their own expert testimony. Once they come over to the maybe you should have done something else, maybe you should have changed that which maybe could have prevented some type of failure, we have now warped over into the warranty of workmanlike performance claim, which the case law is very clear on what elements you have to prove under that claim. Well, I read it as different as them saying you didn't do a good job. And I said I'm not sure what an engine overhaul is, but they're saying we ordered an engine overhaul. To use their analogies, you go get your car fixed and you ask for a complete twenty-point check and they only do a one-point check. They didn't do what they were promised. And I did ask those questions of Mr. Marion because they started getting into this overhaul semantics discussion, I think, when they saw the previous testimony from the other experts. And I asked Mr. Marion, I said, well, you're talking about an overhaul. What is an overhaul? Define it for me. And he said, well, I know you would replace the liner and I'm not really sure, I didn't investigate that. I said, okay, what's in an overhaul kit? Because that's our understanding of what an overhaul is. We get those from Interstate McBee here in Louisiana. It has a list of items that comes in when we do an overhaul. Those parts go into the engine. That's what an overhaul is. I asked their expert, Mr. Marion, what comes in an overhaul kit? I didn't investigate that. I don't know. So even on the issue when we're talking about your question about what is an overhaul, which is a great question for us lay people in that engine world, even their own expert, who, in defense to him, they only gave him a week for providing the information and asking for an expert report, but even he was not able to answer that question of specifically what parts. I'm sorry, go ahead and finish. I'm sorry, but what parts would be in that? He couldn't even answer that question. So we're getting into that semantics. They can't even define the semantic they're creating. But we do know that the engine sailed between the New Orleans area and Columbia. What's that distance, 900 miles? I believe it was, I think it was 1,500 miles. All right, 1,500 miles. And some expert said if you do an overhaul properly, you shouldn't need to do it again for 5,000 hours of engine running. And that's assuming all the other parts of the engine would be working correctly. And I think on that, Your Honor, we are now into the warranty of workmanlike performance claim on there is no res ipsa. And when you look at the offshore specialty versus Dumas case, which I happen to have been trial counsel in that case, that's exactly what the court said there. The court said, well, under the warranty of workmanlike performance claim, you have to prove what caused the failure. That's your burden. If you don't do that, we don't get to the other side. And if there's alternative causes, that can knock your cause out too. You cannot do a res ipsa argument. In that case, we had a similar situation where we had a failure. That was a bench trial though, right? I think almost all the cases you cite are ones that went to bench trial and the court weighed the evidence and said, well, plaintiff didn't prove his case. That was a bench trial. Here's the one, and that's, you know, opposing counsel keeps saying there's distinctions in the cases. That is correct. That one's a bench trial. It was before Judge Morgan. And here's the thing about that is that they had a causation theory. That's what's different from this case. When you're in Dumas and you started talking to them about what the theory was, they said, well, improper alignment caused by the computer is what caused the failure. Okay? So they had experts lined up. Computer was failed. Computer was failed. Computer was failed. That's exactly what caused this failure. That's a lot different from today. Well, here he's claiming we ordered overhauls on these engines and our experts who examined these engines said no overhaul was performed. And the proof of the pudding is the engines broke down on a relatively short journey in far less time than the 5,000 hours needed to run an engine before you need another overhaul. For summary judgment purposes, we're dealing, as Judge Costa points out here, we're not dealing with bench trial where findings of fact are reviewed for clear error. We're reviewing a summary judgment. And I understand that, Your Honor. I think the difference is when we do have that failure, because of all of the other auxiliary systems like, for example, the coolers that cool these engines, the exhaust piping, which was not replaced, which puts soot in the engine room, all of these other theories come into that. They have to prove a causation. So in that time period, what caused that failure? No, sir. My point is why do they have to prove causation when they're saying breach of contract, we ordered an engine overhaul and you didn't give us an engine overhaul based on our experts' examination of the engines? We asked those experts, can you tell us that an engine overhaul was not performed? And they said, we need additional investigation. We only did a conditional survey to tell you what the condition is today. We cannot tell you what happened to those engines before. I believe that was a direct quote. We cannot tell you whether or not an overhaul was performed unless we do those additional breakdown of the engines. And I think when we get into exactly what was done, and they keep talking about circumstantial evidence and things like that, they had the direct evidence. They had each part we put in there as a serial number, a date, and a manufacturer. They still have these boats. Our parts we put in there are still in there. I don't know why we're talking about circumstantial evidence. They had the direct evidence in their hands. That's a great argument, too. So you're saying there's nothing, if I understand you, correct me if I'm wrong, you're saying there's nothing in the summary judgment record to support that no overhaul was done? Exactly. There's nothing in there to support no overhaul was done. There is information in there to support some work was done, and then there's also four years and four experts of litigation. There is no causation. That's what's different from that Dumas case. In the Dumas case, they had a causation theory. Maybe it wasn't a good one that didn't win, but it got them to a judge. When Judge Feldman looked at them and said, I need a causation theory, they didn't have one. When each expert, all four was asked, what caused the failure? Each of them said, we don't know. We would have to do a further investigation. Well, I'm forgetting about causation again for a second. I'm just going back to the issue of whether an overhaul was performed. On cross-examination, you had some very good questioning, and you got them to admit . . . Basically, I read the experts to say on cross-examination, without getting in there and looking at the entire engine and pulling it out, I can't definitively say that there was no overhaul done. Is the standard that they need to have a testimony with 100% certainty that there was no overhaul? Why isn't all the circumstantial evidence they've identified of corrosion and all these other observations they've made, why doesn't that at least create an issue of material fact? Well, Judge, the fact that they're saying that they cannot say whether an overhaul was done . . . We also asked them questions on, how do you define an overhaul? And, they couldn't even tell us that. So, I mean, we're in such a semantics game here. I mean, it really felt like a moving target. In the beginning of this case, look at the complaint. It says, you didn't do any work. Then, as we kind of went on, it started to become this semantics game of you did not do an overhaul. But, there's nothing in the record saying what an overhaul is. And, by the way, we used the overhaul kits from Interstate McBee, which is also in the record. All of those records are in there. Well, maybe that's the problem we have here with what both sides agreed to on this moving target contract to go through. And, as you go along, tell us what you need to do, and we'll decide whether or not to agree to do it. And, apparently, they agreed to all requests concerning the overhaul. Your Honor, that is hotly contested whether they agreed to it. I said apparently. Apparently. Okay. What I would say is whether or not— And, when you say it's hotly contested, that just shows us there's a genuine dispute of material fact. But, it may be a genuine dispute of material fact on if they agreed to certain repairs that we were recommending. But, when we're talking about the two claims, it is a material fact, but it's not a material fact that bears on their claims. Their first claim, contract claim, he did no work. That's gone. Second claim, warranty of work no like performance. Causation is an essential element. Cannot use res ipsa as per Dumas, as well as the other line of cases. And, they can't prove causation. But, they're also making a claim for breach of contract. And, Judge Fellman did not rule on that. And, they post-trial moved for, quote, new trial, close quote, because he failed to rule on breach of contract. And, once again, he did not rule on breach of contract. Well, I do believe, Your Honor, that when you look at pages eight and nine of his decision, he does talk about that breach of contract claim. But, does he say, does he ever use the word breach of contract? No, Your Honor. When you look at their paragraphs in their complaint, they have four paragraphs where they talk about the breach of contract, where they say that we did no work. And, when you look at section B1i. Because he says in the start of B2i at page nine, as to whether repairs were performed inadequately, OTM alleges claims for negligence and breach of the implied warranty of workmanlike performance. Well, implied warranty of workmanlike performance may be a term of art for breach of contract. But, he never mentions breach of contract or the elements or what their breach of contract claim is. When we look at it, it's the sentence right after B. He talks about both claims right before the little i. It's on page eight, I believe, Your Honor, at the top of page eight. Judge Feldman says that they make two claims. One is that no work was performed. And, second is that the work that was performed was inadequate. Then, he goes into 1i. Again, I'm just trying to keep us straight here on this argument. At cap B, at page eight, he says, OTM contends either that Diversified did not overhaul its vessels as it claims it did, or that the repairs were substandard. He doesn't say no work was done. When we look at B.I. and we look at the last sentence, OTM's allegations that Diversified performed no work on the engines is unsupported by the sworn testimony of its experts. Top of page nine. He's getting that from the complaint. That's different from what he says the issues are. Again, of course, the opinion in a summary judgment matter is entitled to no deference because we engage in de novo review here. But it just appears that the breach of contract claim, whatever that was, was just totally overlooked, including when they ask him to correct it after he issued the summary judgment and his order, once again, does not mention breach of contract. Your Honor, I think that when we look back at the complaint and we look at their allegations, that is why he worded it the way he did in B.I. That entire eight to nine was tracked from their complaint. That was what their breach of contract was, that no work was performed. And then they went into the shoddy work was performed. So while he may not have used the terms of art in B.I., I am addressing the contract claim outlined in their paragraphs, whatever. When you look at that language and you track it, that was exactly what he was doing in B.I. I think he was just tracking it from what their complaint was. As far as causation, though, and the warranty of workmanlike performance, Your Honor, I think we are clear that none of their experts, after four years and four experts, none of them can opine on causation. So when we went to trial, three of their experts were going to be via deposition. We already had the pretrial order done. Those people were not coming live. Judge Feldman was sitting as far as those depositions as a trial court, and he had all of that testimony in front of him. So nothing was going to get better. When he looked at it, and those people could not opine on causation, that is what led him to the summary judgment. That's what I think he addressed in B.I. too. One distinction, and we talked about the other cases, the Marquette case, which I think, Judge Smith, you were on the panel on that one, the Kevin Grove quality diesel, the offshore Dumas, and the Penn Maritime versus Rhodes. I was trial counseling the Grove, the Dumas, and the Penn Maritime. In each one of those cases, my opponent had a very specific expert with a very specific theory coming against us. Those didn't win, but that's why we ended up going to trial. In this case, we never got a causation, Your Honor, and I think that's why the summary judgment is correct. We weren't dealing with a performance claim as well. All right. Thank you, Mr. Schlatterer. Thank you. Those handouts, if you still want them, you can give them to Ms. Pollard over here after the arguments are completed. Okay, Mr. Crawford, you saved time for rebuttal. Handouts on? No, I just need to see it because I'm going to address it. This is the judge's room. May it please the Court, there's a lot of area to cover there. I've got five minutes, so let me see what I can do. One thing counsel said was that there were no repairs done to the exhaust piping. That's not true. There were $6,000 charged for repairs to the exhaust piping. We brought that point up in our opposition to their motion because their contention was that a lot of the damage that was ultimately discovered was caused by exhaust from the piping. We're like, well, we don't agree with that, and our experts have said why, but if you accept your premise of your expert, one reason for that damage is because the exhaust piping that you repaired was deficient, and that deficiency was very clearly delineated in Mr. Hoyos' deposition because he said he's describing it. They have taken something that is leaking and corroded, and they have doubled it, and he says very blatantly that is an improper repair. So their own expert identifies exhaust as the source of the problem with the engines. They repaired the exhaust, and Mr. Hoyos said the way they repaired the exhaust piping was improper. I will not shy away from Judge Feldman's decision on page 8 of his opinion. I think very significantly about the middle of subpart I, he says they, meaning the experts, were never asked whether the engine showed signs of a recent overhaul. Well, that's just flat-out untrue, and I pointed it out to him repeatedly time and time and time again. Mr. Santamaria went through chapter and verse, so did Mr. Hoyos, so did Mr. Guerrero. In terms of counsel's suggestion that he got a complete repudiation from Mr. Marion, he's saying he doesn't even know what an overhaul is, the actual question that was asked was what are the individual parts that are included in an overhaul kit? It wasn't what is an overhaul. You don't even know what an overhaul is? This was the vice president of engineering for Detroit Diesel, for God's sake. The man did not ask him, you can't tell me what an overhaul is? That's flat-out untrue. Now, I will direct you. Mr. Marion's deposition appears, I apologize, but more than once in the record. The one that we cited to in our brief is not the one that my paralegal copied for me yesterday, but if you look beginning around page 5944, and this is his deposition, it has four pages. On page 131 of his deposition in lines six and seven, I'm not going to read all the observation, these types of observations lead me to believe that the engines were not overhauled. I don't know how much plainer he wants it than that. At the bottom of page 138, which is on record 5945, but even without the benefit of a micrometer, which is a device you use to measure, just the fact that it's scratched indicates something, doesn't it? Yeah, the scratched and metal-to-metal contact, to me, that's an indication that that engine needs to be overhauled, which is another indication that it wasn't overhauled ten days before that. I don't know how much plainer you get than an expert who's written a report saying there is no evidence that it was overhauled and there is evidence that it was not overhauled, and then he testifies very explicitly, this tells me there had been no overhaul. It's straightforward. How that doesn't give rise to a material issue of fact, I don't know. I could certainly point you, and I had this originally. I'll take my last minute. I had it marked. I apologize. I'm moving papers. I don't need to move. This is Mr. Guerrero's deposition. It's at record page 1309. My law partner, John Cialdoni, is asking the question at line 8. Mr. Santa Maria also testified in his earlier deposition that these reports indicated that the engines did not show any evidence of having recently been rebuilt or overhauled. Would you agree with that? Answer, yes. Because of the physical inspection, yes. Again, Mr. Guerrero, not a litigation expert, a real, true-life Detroit diesel technician who was retained at the very beginning to do an evaluation, goes through in detail and says there's no indication of an overhaul. Thank you, Your Honor. Thank you, Mr. Crawford. Your case and all of today's cases.